# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| TROY MCCOY, individually and on behalf of all others similarly situated,<br><br>         Plaintiff,<br><br>    v.<br><br>NORTH STATE AVIATION, LLC, NORTH STATE AVIATION HOLDINGS, LLC, and NSA HOLDINGS, INC., (f/k/a NSA HOLDINGS, LLC),<br><br>     Defendants. | Case No. 1:17-cv-00346-CCE-LPA |

_____

## PLAINTIFF'S MOTION FOR FINAL APPROVAL
## OF CLASS ACTION SETTLEMENT AND INCORPORATED
## MEMORANDUM IN SUPPORT
_____

COMES NOW Plaintiff, Troy McCoy ("Plaintiff") and moves this Court for

an order granting final approval of Class Action Settlement and for other related

relief.  In support thereof, Plaintiff states as follows:

1

## I. INTRODUCTION

Plaintiff respectfully requests that the Court issue an order granting final approval to the Settlement Agreement (the "Settlement" or "SA"), certifying a class for settlement purposes only, and enter a final judgment dismissing the case with prejudice.[1]

Following the filing the case, counsel for Plaintiff and Defendants began discussing potential resolution. Over the next eight months, the parties exchanged documents and engaged in protracted arms'-length negotiations by telephone and by email until the parties reached the proposed Settlement.

The SA was preliminarily approved on February 14, 2018. (ECF No. 40.) As discussed below, the terms of the SA create substantial benefits for a class of 345 former employees; are fair, reasonable and adequate; and meet all of the criteria under Fed. R. Civ. P. 23(e) for final approval. Indeed, the overwhelmingly positive response by Class Members confirms that final approval should be granted. The class members were each given direct notice of the settlement and as discussed below, no objections to the SA have been filed. As such, Plaintiffs respectfully

---

[1]     The SA was submitted with Plaintiffs' Notice of Settlement, set forth at Docket Entry No. 31. The capitalized terms used in this Memorandum are defined in Section I of the SA.

request that the Court enter the proposed Order submitted herewith finally approving the proposed settlement.

## II.    PROCEDURAL HISTORY

This action was filed on April 12, 2017. (ECF No. 1.) The complaint alleged that Defendants terminated the employment of 345 employees at the Facility between March 23 and 24, 2017 and provided less than 24 hours' notice of the termination, in violation of the WARN Act. (*Id.*) Concurrent with the initiating complaint, Plaintiff filed a motion to proceed under a fictitious name. (ECF No. 3.) The Court issued a Memorandum Opinion and Order denying the motion to proceed under a fictitious name on May 9, 2017 and ordered Plaintiff to file an amended complaint without use of a fictitious name by May 30, 2017. (ECF No. 7.)

A First Amended Complaint was filed on May 30, 2017 (ECF No. 12), and Defendants filed an answer to the First Amended Complaint on June 12, 2017. (ECF No. 16.) On June 16, 2017, a Second Amended Complaint was filed (ECF No. 19.), and Defendants filed an answer to the Second Amended Complaint on June 29, 2017 (ECF No. 24). The Second Amended Complaint added North State Aviation Holdings, LLC and NSA Holdings, Inc. as Defendants. (*Id.*) On August 25, 2017, following a meet and confer with defense counsel, Plaintiff voluntarily dismissed North State Aviation Holdings, LLC, based upon information and belief that it was

3

not a necessary party to the litigation. (ECF No. 26.)

On February 2, 2018, Plaintiff filed a Motion for Preliminary Approval of Class Action Settlement. (ECF No. 33.) The Court entered an Order granting preliminary approval on February 14, 2018. (ECF No. 40.)

## III. THE SETTLEMENT

### A. Material Terms of the Settlement

In its preliminary approval order, the Court certified the class defined in the Settlement Agreement:

> all persons employed by the Employer who worked at or reported to NSAI's Facility (as defined below) or were on an authorized leave as of March 22, 2017 and who were terminated without cause beginning on or about March 23, 2017, in anticipation of or as the reasonably foreseeable consequence of the mass layoffs or plant closing ordered by NSAI on or about March 22, 2017, and who were affected employees, within the meaning of 29 U.S.C. § 2101(a)(5).

(Ex. 1 at § 1(c).) In exchange for the terms of the Settlement Agreement, the Class Members release all claims that were asserted or could have been asserted based on the factual allegations in the Complaints filed in this litigation.

Class Counsel retained BrownGreer to serve as the Settlement Administrator. (Ex. 1 at § 5.) The Settlement Administrator is responsible for: (a) the preparation and distribution of the Settlement Fund; (b) the preparation and filing of 1099 (for service providers) and/or W-2 Forms (for Class Members); (c) the mailing of the

4

Settlement Notices; (d) efforts to locate payees of returned distributions; (e) between forty (40) and fifty (50) days following the Effective Date, the preparation of a Payment Report, listing all payments made and describing all efforts made to locate Class Member; (f) between three hundred sixty-six (366) and four hundred (400) days following the Effective Date, the preparation of an Escheat Report, detailing the final disposition of all unclaimed Settlement Fund amounts as set forth in Section 7(c); (g) certification to counsel for the Parties that the necessary tax forms have been properly mailed to all Class Members; and (h) filing the necessary tax reporting forms for the payments made. (*Id.*)

The Settlement Administrator is responsible for disbursing the Net Settlement Fund to Class Members. The Net Settlement Fund is the amount remaining in the Settlement Fund after the deduction of the Fee and Expense Award to Class Counsel and the Service Payment to Plaintiff. (Ex. 1 at § 1(k).) The Net Settlement Fund will be allocated as follows:

Exhibit A to the Settlement Agreement lists the Class Members and their corresponding amount of wages each Class Member would have earned during the 60-day period following March 22, 2017. This is based on each Class Member's respective base earnings in the past three (3) years, including health benefits and

401K match (the "Maximum 60 Day Payment").[2] (Ex. 1 at § 7(b)(1).)

The amount of each Class Member's Settlement Benefit will be proportional to the total of all Class Members' Maximum 60 Day Payment (as reduced by actual wages and COBRA stipends). There is a three-step formula for calculating the Settlement Benefit to each Class Member. First, the Maximum 60 Day Payment (as reduced, above) for all Class Members (including Plaintiff) shall be totaled (the "Total Maximum 60 Day Payments"). Second, The Net Settlement Fund divided by the Total Maximum 60 Day Payments yields a quotient known as the "Settlement Ratio." Third, The Settlement Benefit for each Class Member equals the Class Member's Maximum 60 Day Payment multiplied by the Settlement Ratio. For the Plaintiff, his Settlement Benefit shall be increased by the amount of the Service Payment. (Ex. 1 at § 7(b)(2).)

Each Class Member's Net Settlement Check shall be the Class Member's Settlement Benefit subtracted by the following: (1) the Employer's share of FUTA and SUTA taxes; (2) the Employer's and Class Member's share of FICA and Medicare taxes; and, (3) income tax withholding, subject to any federal or state

---

[2] For each Class Member who worked after March 22, 2017, the Maximum 60 Day Payment is reduced by the amount of wages paid for services rendered after March 22, 2017. For each Class Member who was enrolled in the Employer's health benefit plan and received a COBRA stipend (as shown on Exhibit A), the Maximum 60 Day Payment is reduced by the amount of such stipend.

6

requirements for back wages. (Ex. 1 at § 7(b)(3).)

Within thirty (30) business days of receipt of the Settlement Fund or ten (10) business days of the Court's approval of the Fee and Expense Award, whichever is later, each Class Member will be mailed a Settlement Check from the Settlement Administrator. (Ex. 1 at § 7(b)(4).) The Settlement Administrator will withhold (and will pay to the appropriate authority) applicable taxes before distributing these funds to Class Members as shown above. (*Id.*)

Class Members will have one (1) year from the Effective Date to cash or endorse the Settlement Checks. (Ex. 1 at § 7(c).) Any checks remaining uncashed on that date shall become null and void, and any such Class Member will have no further recourse pursuant to the Settlement. (*Id.*) The amount of the uncashed Net Settlement Check funds will be remitted by the Settlement Administrator to the North Carolina Department of State Treasurer, Unclaimed Property and Escheats Division. (*Id.*)

Any payroll taxes ordinarily borne by the Employer shall be withheld pursuant to Section 7(b)(3) of the Settlement Agreement and paid by the Settlement Administrator at the direction of Defendants from the Net Settlement Fund. (Ex. 1 at § 7(e).) The Settlement Administrator shall provide each Class Member with a notice advising him or her to seek personal tax advice regarding any tax

consequences of the Settlement Fund disbursement. (*Id.*)

### B. Rule 23(b)(1)(B) Class

The Settlement contemplates the certification of the settlement class pursuant to Fed. R. Civ. P. 23(b)(1)(B), which provides that a class action may be maintained if "prosecuting separate actions by or against individual class members would create a risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." (Ex. 1 at § 3.) Certification pursuant to this subsection creates a mandatory damages class in which Class Members cannot opt out. As discussed in more detail below, certification of a Rule 23(b)(1)(B) class is appropriate when the solvency of the defendant is at issue and there is only a limited fund of money available to satisfy any claims.

### C. Class Counsel's Fees and Expenses

The parties did not agree to attorneys' fees for Class Counsel, but Class Counsel agreed such amount shall not exceed 25% of the Settlement Fund, exclusive of their actual litigation costs and expenses, including the Settlement Administrator's fees. (Ex. 1 at § 6.) The parties agreed that the Class Representative shall receive, subject to Court approval, a one-time Service Payment of $2,500 from

8

the Settlement Fund for his assistance in bringing this litigation and assisting in its resolution. (Ex. 1 at 7(f).)

Concurrently with their motion for preliminary approval, Class Counsel filed their motion for attorneys' fees. (ECF No. 35, 36.) Class Counsel filed a supplemental declaration with updated lodestar figures on February 9, 2018 and filed a supplement brief with updated lodestar figures on April 13, 2018. (ECF Nos. 38, 43.)

## IV.    The Court Should Grant Final Approval of the Settlement

### A. The Settlement Meets the Requirements of Rule 23

"There is a 'strong presumption in favor of finding a settlement fair.'" *Hoffman v. First Student, Inc.*, No. WDQ-06-1882, 2010 WL 1176641, at *2 (D. Md. Mar. 23, 2010); *see also Brunson v. Louisiana-Pac. Corp.*, 818 F. Supp. 2d 922, 927 (D.S.C. 2011). "Litigants should be encouraged to determine their respective rights between themselves and there is an overriding public interest in favor of settlement, particularly in class action suits." *Lomascolo v. Parsons Brinckerhoff, Inc.*, No. 1:08-cv-1310, 2009 WL 3094955, at *10 (E.D. Va. Sept. 28, 2009).

In this Circuit, a class action settlement should be approved if it is both "fair" and "adequate." *In re Jiffy Lube Securities Litigation*, 927 F.2d 155, 259 (4th Cir. 1991). "The primary concern addressed by Rule 23(e) is the protection of class

9

members whose rights may not have been given adequate consideration during the settlement negotiations." *Id*. at 158 (*citing Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 546 (D. Colo. 1989)). The "fairness" evaluation centers on the settlement process. A settlement is fair if it "was reached as a result of good-faith bargaining at arm's length, without collusion." *Id.* at 159. In making this determination, a court should consider "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of . . . class action litigation [involved]." *Id.*

The "adequacy" evaluation is about the substance of the settlement. *Id.* In assessing the adequacy of a proposed settlement, a court should consider: "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *Id.*

"Ultimately, approval of a class action settlement is committed to the sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of the relevant circumstances."

10

*In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 663 (E.D. Va. 2001). Furthermore, "[b]ecause a settlement hearing is not a trial, the court's role is more 'balancing of likelihoods rather than an actual determination of the facts and law in passing upon … the proposed settlement.'" *Hoffman*, 2010 WL 1176641, at *2 (quoting *Lomascolo*, 2009 WL 3094955, at *10).

## B. The Settlement is Fair

### 1. *The Posture of the Case at the Time Settlement was Proposed*

The first consideration for whether a settlement is fair—whether it was reached through non-collusive, arm's-length negotiations—is the posture of the case at the time settlement was proposed. *Jiffy Lube*, 927 F.2d. at 159. Although the parties began conducting settlement discussions early, it still took approximately eight months of protracted arms-length negotiations by the Parties, which included the exchange of documents and other information, to reach the Settlement.

Furthermore, negotiations were conducted by capable counsel with ample experience managing and litigating class actions. Class Counsel represent that they have spent considerable time and effort investigating the claims asserted and the factual underpinnings of the case. Class Counsel also gathered and carefully reviewed substantial relevant information during the course of their extensive pre- and post-filing investigations. Therefore, Class Counsel was in a position to evaluate

11

the issues they would face at class certification, summary judgment, and trial at the time the parties agreed to the settlement. *See In re the Mills Corp. Sec. Litig.*, 2009 WL 5091931, at *8 (E.D. Va. Dec. 23, 2009) ("It is apparent to the Court that this settlement was not entered into haphazardly with an underdeveloped understanding of the merits of the case. . . . [T]he strengths and weaknesses of this case were well-developed for all parties, such that this factor also militates in favor of the Settlement.").

## 2. *The Extent of Discovery That Was Conducted*

The next factor in the fairness analysis is the extent of discovery that was conducted before settlement. *See Jiffy Lube*, 927 F.2d at 159. In connection with settlement negotiations, Plaintiff requested, and Defendants searched for, collected and produced, documents allowing Class Counsel to fully and completely evaluate the merits of the case and develop detailed estimates of damages. Having developed the facts to this degree, Class Counsel were able to accurately assess the strengths and weaknesses of the case when negotiating the settlement. *See, e.g., Hoffman*, 2010 WL1176641, at *2 ("The record shows that … there has been extensive discovery, assuring sufficient development of the facts to permit an accurate assessment of the merits of the case.").

Case 1:17-cv-00346-CCE-LPA    Document 46    Filed 05/10/18    Page 12 of 28

### 3. *The Circumstances Surrounding the Negotiations*

The fairness inquiry next examines the circumstances surrounding the settlement negotiations. *See Jiffy Lube*, 927 F.2d at 159. The parties negotiated at arms' length over eight months. The absence of collusion is also shown by the terms of the settlement itself. As discussed more fully below, this case presented substantial risks, including the possibility that class certification would be denied or a favorable decision would be reversed on appeal. Under these circumstances, Plaintiff obtained a settlement that conferred significant benefits on a class of 345 individuals who were laid off by Defendants. The comprehensive and arms'-length negotiations confirm that there was no bad faith or collusion. *See Mills Corp.*, 2009 WL 5091931, at *8 ("Negotiations were sufficiently thorough, contentious, and at arm's length to ensure the propriety of Class Counsel's decision to enter into the settlement and the proceedings leading thereto."); *MicroStrategy*, 148 F. Supp. 2d at 664 ("[T]he posture of this case at the time the partial settlement was reached raises no concern that the settlement was reached in bad faith, was not the result of arm's length bargaining, or was a product of collusion among the Settling Parties.").

### 4. *The Experience of Class Counsel in the Relevant Area*

The final consideration in the fairness evaluation is the experience of plaintiffs' counsel. *See Jiffy Lube*, 927 F.2d at 159. Here, Class Counsel has a depth

of experience leading and litigating consumer class actions, including class actions arising under the WARN Act. In negotiating the settlement, Class Counsel assessed the factual and legal issues raised by Plaintiff's claims and Defendants' defenses, and considered the substantial risks of continued litigation. Class Counsel agreed to the proposed settlement on behalf of the Settlement Class only after concluding that under the circumstances, the settlement provided substantial benefits to class members; was a fair, reasonable, and adequate compromise of their claims; and was in the best interests of the class as a whole. *See Mills Corp.*, 2009 WL5091931, at *9 ("In this case, Lead Counsel are highly experienced in the field of securities class action litigation. . . . Lead Counsel's decision to settle the case is the product of thorough exploration and deliberation and as such, 'their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight.'"); *MicroStrategy*, 148 F. Supp. 2d at 665 ("Counsel for both sides of this lawsuit participated in numerous meetings and extensive and intensive discussions extending over a period of months, with plaintiffs' lead counsel pressing their belief in the strength of their case on the merits. Indeed, that counsel for both sides are nationally recognized members of the securities litigation bar further minimizes concerns that the Settling Parties colluded to the detriment of the class's interests.").

## C. The Settlement is Adequate

### 1. *The Relative Strength of Plaintiffs' Case, Difficulties of Proof, and Existence of Strong Defenses*

In *Jiffy Lube*, the first two considerations in the adequacy analysis are "(1) the relative strength of the plaintiffs' case on the merits," and "(2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial." 927 F.2d at 159. Because these factors are related, Plaintiffs address them together.

This complex class action was litigated for nearly one year before Plaintiff's motion for preliminary approval was submitted to the Court. In bringing this action to a successful conclusion, Plaintiff's counsel engaged in discovery and extensive, protracted settlement negotiations. Several courts have recognized that "any class action presents complex and difficult legal and logistical issues which require substantial expertise and resources." *Stalcup v. Schlage Lock Co*., 505 F. Supp. 2d 704, 707 (D. Colo. 2007); *see also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (district court did not abuse its discretion in concluding that – in light of legal issues, duration of the case, discovery, and the necessity of resorting to mediation to reach a final settlement – the matter was complex).

A significant, and potentially dispositive, defense that Defendants would have likely raised if the case proceeded to trial is the "unforeseeable business

circumstances" defense. This allows an employer to order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable at the time notice would have been given. *See* 29 U.S.C. § 2102(b)(2)(A). Examples of this include the sudden and unexpected termination of a major contract and unanticipated economic downturn. 20 C.F.R. § 639.9(b)(1). Thus, proceeding to trial may result in no recovery for the Class Members. *See, e.g.*, *McLaurin v. Prestage Foods, Inc.*, No. 09-100, 2011 WL 13146422, at *4 (E.D.N.C. Nov. 9, 2011) (stating "while plaintiffs' counsel voice confidence in the strength of their case, they also acknowledge that proceeding to trial would take substantial time and money without a guaranteed recovery and that defense counsel has raised untested defenses that, if successful, might defeat all or part of plaintiffs' claims"). If Defendants were successful in raising this defense, Plaintiff and the Class Members would not have recovered anything at all.

### 2. *The Anticipated Duration and Expense of Additional Litigation*

In determining adequacy, the Court should also consider the anticipated duration and expense of continued litigation. *See Jiffy Lube*, 927 F.2d at 159. Prosecuting this case through class certification and trial would have been very time-consuming and costly. The major stages in this case remaining before trial—class

16

certification and summary judgment—would have entailed protracted, fiercely contested proceedings, as would the trial itself and any ensuing appeals. Extensive expert testimony regarding both the propriety of class certification and the issues raised by the case would be required. *See Mills Corp.*, 2009 WL 5091931, at *10 ("It goes without much debate that any future proceedings leading up to, and including trial would be just as antagonistic and expensive, and lengthy post-trial motions likely would be filed."); *MicroStrategy*, 148 F. Supp. 2d at 667 ("[A]dditional litigation of plaintiffs' claims … would likely have been protracted and costly, requiring extensive expert testimony …. Nor is it likely that this litigation would have ended with a jury verdict; there is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs.").

### 3.    *Defendants' Solvency and the Likelihood Of Recovery*

The insolvency of the Defendants strongly supports settlement. For many months prior to the shutdown of Defendants' Facility in late March 2017, the Defendants had been operating on a negative cash flow basis and had only been able to continue to operate by depleting their cash and increasing their short-term borrowings. During the first quarter of 2017, the Defendant's business prospects

deteriorated such that there were no prospects for the Defendants to begin operating at break-even or positive cash flow in the near term. The Defendants were unable to continue to borrow additional funds without any prospect of repayment in the near term. Thus, the Defendants shut down their operations and began to liquidate assets and to collect receivables. The Defendants were insolvent when they closed the Facility at the end of the first quarter of 2017 and have remained insolvent since that time. As of January 22, 2018, the Defendants' liabilities, including their liability under the WARN Act, exceed the value of their assets by more than $2,500,000.00.

If the case continues to be litigated through trial, Defendants may not be able to withstand a judgment. *See Decohen*, 299 F.R.D. at 480 ("The defendant's solvency may be relevant in evaluating the settlement's adequacy if the defendant likely could not satisfy a litigated judgment, 'thus making settlement the only means for claimants to recover at all.'" (quoting *In re Serzone Products Liab. Litig.*, 231 F.R.D. 221, 245 (S.D. W. Va. 2005)). As such, the solvency of Defendants strongly supports the adequacy of the settlement.

### 4. *The Degree of Opposition to the Settlement*

The final consideration is the level of class member opposition to the proposed settlement. *See Jiffy Lube*, 927 F.2d at 159. Here, the adequacy of the settlement has been confirmed by the response of class members: no class members have objected

to the Settlement. *See Hoffman*, 2010 WL 1176641, at *2 (granting approval where "no class member has objected to the proposed settlement and the parties' counsel attest to the fairness of this proposal in their joint motion to approve the class-wide settlement") (footnote omitted); *Mills Corp.*, 2009 WL 5091931, at *12 ("[N]ot a single putative class member objected to the settlements. This gives the Court a great deal of confidence in the settlement's adequacy, which is further bolstered by the paucity of opt-outs from the Class.") (footnote and citation to record omitted); *Vaughns v. Bd. of Ed.*, 18 F. Supp. 2d 569, 580 (D. Md. 1988) (approving settlement where only "a very limited degree of opposition to the settlement has been voiced by class members").

## V.    The Court Should Affirm Its Certification of the Settlement Class

As this Court has already held, the Settlement Class meets the requirements for certification for settlement purposes under Fed. R. Civ. P. 23. "Specifically, the Settlement Class meets the four basic requirements of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Additionally, the Settlement Class fulfills the requirements of  Fed. R. Civ. P. 23(b)(1)(B), which permits certification where "prosecuting separate actions by or against individual class members would create risk of . . . adjudications with respect to individual class members that, as a practical

matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."

Numerosity requires that a class be so large that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, there are 345 Class Members. As such, numerosity is easily satisfied here. *See, e.g.*, *Holsey v. Armour & Co.*, 743 F.2d 199 (4th Cir. 1984) (holding that the numerosity requirement was met with a proposed class of 46 to 60); *Thomas v. Louisiana-Pacific Corp.*, 246 F.R.D. 505, 509 (D.S.C. 2007) (approving a class action with approximately 130 members).

### A. Commonality

To meet the commonality requirement of Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Here, there are numerous questions of law and fact, including whether Defendants failed to give the requisite notice under the WARN Act and whether Defendants could satisfy any of the applicable defenses under the WARN Act, that are common to the Class Members. As such, commonality is easily satisfied here.

Next, typicality requires the Court to examine the extent to which the claims and defenses of the named class members are typical of the claims or defenses of the absent class members. Fed. R. Civ. P. 23(a)(3). "[W]hile the commonality

requirement focuses on the claims of the class as a whole, the typicality requirement focuses on the named plaintiff's claim." *Tatum v. R.J. Reynolds Tobacco Co.*, 254 F.R.D. 59, 64 (M.D.N.C. 2008) (citing *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)). The Plaintiff's "interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).

Here, Plaintiff's claim and the claims of the Class Members all derive from Defendants' decision to terminate their employment at the Facility. All Class Members were terminated within days of each other, all far short of the 60-day requirement in the WARN Act. As such, Plaintiff easily satisfies the typicality requirement.

The last factor under Rule 23(a) requires the Court to find that the class representative be capable of fairly and adequately representing the interests of the class. Fed. R. Civ. P. 23(a)(4). "To meet this requirement, a plaintiff must demonstrate that he or she (1) 'will vigorously prosecute the interests of the class through qualified counsel' and (2) that they have 'common interests with unnamed members of the class.'" *Beaulieu*, 2009 WL 2208131, at *15 (quoting *Olvera–Morales v. Intern. Labor Mgmt Corp.*, 246 F.R.D. 250, 258 (M.D.N.C. 2007).

First, Plaintiff has common interests with the unnamed members of the Settlement Class, as discussed above in the section analyzing typicality. He does not possess any interests antagonistic to the Settlement Class. Second, Plaintiff's counsel is undoubtedly qualified. As demonstrated by the accompanying firm resumes, both Sauder Schelkopf LLC and the Law Offices of Jean Sutton Martin PLLC have substantial experience representing individuals in class action lawsuits, and have successfully resolved other class action litigation involving alleged violations of the WARN Act. These firms have vigorously prosecuted the instant litigation and achieved a very favorable settlement that provides prompt compensation for the 345 Class Members. Second, Finally, Plaintiff seeks to have the Settlement Class certified pursuant to Rule 23(b)(1)(b), which permits certification if "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." As discussed above, Defendants are insolvent and thus there is a limited fund of money against which Class Members could make claims.

Numerous courts have certified classes raising WARN Act claims pursuant to Rule 23(b)(1)(B) when a limited fund is available for claims. *See, e.g.*, *Washington v. Aircap Indus. Corp.*, 831 F. Supp. 1292 (D.S.C. 1993) (certifying a WARN class

action under Rule 23(b)(1)(B) and stating "[a] decision in this case would preclude defendant or a potential plaintiff from raising certain issues regarding the application of the [WARN] Act" to the allegedly improper layoffs); *Cruz v. Robert Abbey, Inc.*, 778 F. Supp. 605 (E.D.N.Y 1991) (WARN Act plaintiffs met the requirements of Rule 23(b)(1)(B), because "adjudication of facts concerning lay-offs executed by [the employer] will dispose of all of the classes' WARN claims").

Moreover, numerous courts have also certified Rule 23(b)(1)(B) classes in limited fund cases outside the WARN Act with substantially similar rationales. *See, e.g.*, *McLaurin*, 271 F.R.D. at 478 (explaining "[t]hat is why Rule 23(b)(1)(B) is invoked in 'limited fund' circumstances, whereby individual lawsuits may exhaust the limited amount of assets available and leave some claimants without a remedy" and denying certification because "Plaintiffs have failed to identify the insufficiency of any fund"); *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 326-27 (N.D. Tex. 2011) (observing that "[t]his kind of class action necessarily provides for mandatory participation by class members because allowing class members to opt out of the class and pursue individual claims would deplete the fund to the detriment of other class members."). Thus, due to the insolvency of the Defendants and the limited fund available for the Class Members, certification pursuant to Fed. R. Civ. P. 23(b)(1)(B) is appropriate here.

## VI.    The Notice Program Satisfies Rule 23

Under Federal Rule of Civil Procedure 23, when a proposed settlement has been reached in a class action case, the class members must be given notice of the settlement. Fed. R. Civ. P. 23(e)(1).  The Notice Program, as preliminarily approved by the Court and as carried out, satisfies each of the *Hoffman* factors for procedural fairness. *See Hoffman*, 2010 WL 1176641, at *1-2.

First, notice has been provided to Class Members in accordance with the Preliminary Approval Order. (Declaration of Andrew W. Oxenreiter, ¶¶ 8-9.) The notice plan approved by the Court included direct emailing or mailing of the notice to 345 class members. (ECF No. ¶¶ 8-9 (approving plan).) Second, the Notice advises Settlement Class Members that the Court will hold a public hearing on June 13, 2018 at 10:00 a.m. to determine whether the settlement is fair, reasonable, and adequate for purposes of final approval of the settlement. Third, the parties have filed the Settlement Agreement and all of its exhibits on the docket. The Notice contained a summary of the Settlement's terms set forth in an informative, coherent and easy-to-understand manner, all in compliance with the Manual for Complex Litigation's recommendation that "the notice contain a clear, accurate description of the terms of the settlement."  Manual for Complex Litig. at § 21.312.  Fourth, the Notice advised Class Members of their right to object to the proposed settlement and

the procedure for doing so, but no Class Members objected. (Preliminary Approval Order ¶¶ 15-16.)

## VII.   Plaintiff's Counsel Should Be Appointed as Class Counsel

Under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, the court must consider the proposed class counsel's (1) work in identifying or investigating potential claims, (2) experience in handling class actions or other complex litigation and the types of claims asserted in the case, (3) knowledge of the applicable law, and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

As discussed above, and as detailed in firm biographies previously provided to the Court, (ECF No. 36.1 and 36.2), proposed Class Counsel have extensive experience prosecuting similar class actions, including WARN Act cases, and other complex litigation. Further, proposed Class Counsel have diligently investigated and prosecuted the claims in this matter, have dedicated substantial resources to the investigation and litigation of those claims, and have successfully negotiated the Settlement of this matter to the benefit of Plaintiff and the Settlement Class. Accordingly, the Court should appoint Joseph G. Sauder of Sauder Schelkopf LLC and Jean Sutton Martin of Law Office of Jean Sutton Martin PLLC as Class Counsel.

25

## VIII.  CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant Plaintiff's motion for final approval.

Dated: May 10, 2018

Respectfully submitted,

s/ Jean Sutton Martin
Jean Sutton Martin
North Carolina Bar Number 25703
**LAW OFFICE OF JEAN SUTTON MARTIN PLLC**
2018 Eastwood Road Suite 225
Wilmington, NC 28403
Telephone: (910) 292-6676
Facsimile: (888) 316-3489
Email: jean@jsmlawoffice.com

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
**SAUDER SCHELKOPF LLC**
555 Lancaster Avenue
Berwyn, Pennsylvania 19312
Telephone: (610) 200-0580
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com

*Attorneys for Plaintiff and the Class*

**CERTIFICATE OF WORD COUNT**

I HEREBY CERTIFY that the foregoing Memorandum complies with Local Rule 7.3(d)(1) and contains 5411 words not including the caption, certificates, and signature blocks. I further certify that I relied on the word count feature provided in the Microsoft Word software.

Dated: May 10, 2018

Respectfully submitted,

/s/ Jean Sutton Martin
JEAN SUTTON MARTIN
North Carolina Bar Number 25703
jean@jsmlawoffice.com
LAW OFFICE OF JEAN SUTTON
MARTIN PLLC
2018 Eastwood Road Suite 225
Wilmington, NC 28403
Telephone: (910) 292-6676
Facsimile: (888) 316-3489

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 10, 2018 a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon D.J. O'Brien, III, and Matthew B. Tynan, attorneys for Defendants, via transmission of Notice of Electronic Filing generated by CM/ECF.

/s/ Jean Sutton Martin
JEAN SUTTON MARTIN
North Carolina Bar Number 25703
jean@jsmlawoffice.com
LAW OFFICE OF JEAN SUTTON
MARTIN PLLC
2018 Eastwood Road Suite 225
Wilmington, NC 28403
Telephone: (910) 292-6676
Facsimile: (888) 316-3489
